UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

ALAN AGIN,

        Plaintiff,

v.                                                                          Case No. 1:05-CV-589

LIBERTY LIFE ASSURANCE                                HON. GORDON J. QUIST
COMPANY OF BOSTON,

        Defendant.

_____/

## OPINION

Plaintiff, Alan Agin ("Agin"), has sued Defendant, Liberty Life Assurance Company of Boston ("Liberty Life"), under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 to 1461, for review of Liberty Life's denial of long-term disability ("LTD") benefits. Agin alleges that Liberty Life improperly terminated his disability benefits, after its predecessor had determined that Agin was disabled. The parties have filed cross motions for entry of judgment based upon the administrative record pursuant to the procedure set forth in Wilkins v. Baptist Healthcare System, Inc., 150 F.3d 609 (6th Cir. 1998), for determining ERISA denial of benefits claims. For the reasons set forth below, the Court will grant Liberty Life's motion, deny Agin's motion, and enter judgment affirming Liberty Life's decision to terminate benefits.

## Facts

Liberty Life provides long term disability (LTD) benefits to employees of Steelcase, Inc. ("Steelcase") pursuant to a group disability policy that was effective March 1, 2000 (the "Liberty Life Policy"). (McGee Aff. ¶ 2.) In addition, Liberty Life provides administrative and processing

services to Steelcase in connection with Steelcase's self-insured short term disability plan as well as Steelcase's self-insured long term disability plan. (Id.) Steelcase's Disability Income Benefits Plan ("the Plan") consists of self-funded short term and long term benefits during the first twelve months of an employee's disability, and fully-insured group disability benefits under a disability insurance policy that becomes applicable after the initial twelve-month period. (Id.) During the first twelve months of disability, an employee is disabled if he is unable to perform his own job or occupation, and after one year (under the fully-insured portion), an employee is disabled if he is unable to perform "the usual duties of any other suitable job that meets his restrictions, or for any occupation for which he is or may reasonably become qualified base on his education, training or experience." (A.R. at LL-1392, LL-1509.)

Prior to March 2000, Employers Insurance of Wausau ("Wausau") provided group LTD insurance to Steelcase. Wausau, like Liberty Life, provided similar administrative and processing services to Steelcase, and, like Liberty Mutual's policy, coverage under Wausau's policy became effective after benefits were paid for twelve months under Steelcase's short term and long term disability plans. (Id. ¶ 3.) It appears that the LTD policy issued by Wausau for the period March 1, 1997, to March 1, 1998 (the "Wausau Policy"), a copy of which is attached as Exhibit B to the affidavit of Paula McGee and made a part of the administrative record as LL-1318 through LL-1343, remained in effect until early 2000, when Liberty Life acquired Wausau, assumed responsibility for administering Steelcase's short and long term disability plans, and issued a new LTD policy to Steelcase. The Wausau Policy defines disability as follows:

> TOTAL DISABILITY. An Employee will be considered Totally Disabled if because of Injury or Sickness, an employee for medical reasons, is unable to perform the duties of his employment. That is, he cannot carry on the usual duties of his regular

job or of any other suitable job that meets his restrictions, or for any occupation for which he is or may reasonably become qualified based on his education, training or experience.

(Administrative Record ("A.R.") at LL-1321.)  Liberty Life's Policy provides a similar definition of disability for any occupation benefits:

if the Covered Person is eligible for the Any Own Occupation benefit, "Disability" or "Disabled" means the inability to perform the usual duties of Any Occupation or any other suitable job that meets his restrictions, or for Any Occupation for which he is or may reasonably become qualified based on his education, training or experience.

(A.R. at LL-1284.)

Agin was employed with Steelcase for approximately 30 years, most recently as a production superintendent.  Agin injured his back in May 1997, when he slipped and landed on his back while helping his son pull a large root out of the ground using a chain.  He experienced pain in his back immediately.  X-rays taken the following day were negative, and Agin was given medications and sent home.  Agin's pain increased as a result of his job duties at Steelcase, and his primary care physician, Dr. Jon Gans, M.D., referred Agin to Dr. John Stevenson, M.D., for a neurological examination.  An MRI of the lumbar spine revealed lumbar stenosis at L4-5 and L5-S1 with disc bulging.  Dr. Stevenson recommended a trial of injections for pain management.  Agin was referred to Michigan Pain Consultants, where he was evaluated by Dr. Daniel Mankoff, M.D.  Dr. Mankoff prescribed a series of epidural injections, which provided only short-term relief.  Eventually, Agin returned to Dr. Stevenson for re-evaluation.  Dr. Stevenson recommended surgery, and on April 19, 1999, he performed a bilateral foraminotomy with decompressive lumbar laminotomies at L4-5. Agin received short-term disability benefits commencing on that date.  The surgery resulted in some

decreased pain, but it did not provide significant relief.  Agin did not return to work at Steelcase at any time after the surgery.

Agin continued to experience pain in his lower back and into his hips.  Dr. Stevenson prescribed physical therapy and pain medications, including Vicodin.  In an August 3, 1999, office visit with Dr. Stevenson, Agin reported back and hip pain that worsened when he stood and subsided when he sat down.  (A.R. at LL-1215.)  Dr. Stevenson noted that Agin had not had any injections since the surgery and that Agin had seen a doctor for evaluation of his hips and another doctor for a rheumatologic evaluation, both of whom reported negative findings.  (Id.)  Dr. Stevenson suggested that Agin obtain another MRI to determine whether there was any other explanation for Agin's pain, but he noted that if the MRI showed only degenerative changes, treatment would be nonsurgical, such as injections.  (Id.)  Following an MRI scan, Dr. Stevenson reported that the MRI showed postsurgical changes at L4-5 and mild degenerative changes, but no obvious significant neural compression.  A subsequent MRI scan of Agin's lumbar spine performed on February 15, 2000, showed a large cyst at the L4-5 level on the right side.  (A.R. at LL-1108.)  However, Dr. Vincente Gracias, M.D., who examined Agin on February 21, 2000, noted that the cyst on the right-side did not correlate with Agin's pain symptoms on the left side and that the MRI was otherwise unremarkable.  (A.R. at LL-1157-58.)

In October 2000, Agin was examined by several specialist physicians at the Mayo Clinic upon a referral by Dr. Gans.  The final diagnoses were: (1) low back pain; (2) noninsulin-dependent diabetes; (3) tobacco abuse/overweight/alcohol use; (4) no evidence of abdominal aortic aneurysm; (5) probably obstructive sleep apnea; (6) history of back and upper extremity stiffness; (7) status post left-sided L4 and 5 laminectomy; and (8) right lumbar spine synovial cyst.  (A.R. at LL-1097.)  The

4

physicians also noted: "There is no weakness.  Reflexes are normal.  The patient's EMG is essentially negative. . . . [and there was] no evidence of a lumbar radiculopathy in this patient." (A.R. at LL-1098.)  The Mayo Clinic physicians concluded that surgery was not warranted and that Agin's only relief would be through pain management.  (A.R. at LL-1025.)

Agin resumed pain management treatment with Dr. Mankoff on essentially a monthly basis, which included trigger point injections, selective nerve root injections, and epidural steroid injections, along with facet rizotomy procedures.  In addition, Agin has been on various narcotic medications, including Vicodin, Oxycontin, Methadone, Neurontin, Morphine, and Duragesic patches.

Wausau approved Agin's claim for own occupation LTD benefits under the self-funded portion of the Plan on October 19, 1999.  (A.R. at LL-1156.)  On April 20, 2000, Liberty Life approved Agin's claim for any occupation benefits under the fully-insured portion of the Plan.  In connection with its review of the claim, Liberty Life requested medical information from Drs. Gans, Stephenson, Gracias, and Mankoff.  (A.R. at LL-0029 (Claim Note 15).)  Liberty Life continued to request updated medical information and records from Agin's medical providers after it granted him any occupation LTD benefits.  In December 2000, Agin informed Liberty Life that he had been approved for receipt of Social Security benefits, retroactive to December 1, 1999.  (A.R. at LL-0040.)

In July 2003, Liberty Life retained MJM Investigations, Inc. to conduct video surveillance of Agin's activities.  MJM conducted surveillance on July 17, 18, 24-26; August 12, 25, 29; September 5; October 16; and November 3, 2003.  The video tape for those days generally shows Agin driving around in his car running errands at various stores, visiting a nursing home or

retirement center, and going to restaurants and bars.  Agin is shown getting into and out of his car slowly, but with no difficulty or assistance.  In at least two instances, without any indication of pain, he bent down at the waist apparently to retrieve something from the floor of his car or to wipe something off the bottom of his car door.  On October 16, 2003, the investigator observed Agin running errands, visiting a restaurant, and visiting a bar over the course of more than five hours. (A.R. at LL-0891-94.)  In October 2003, Agin submitted a completed activities questionnaire to Liberty Life, in which he stated that he could sit for only 20-30 minutes, could stand for only 2-3 minutes, and could walk for only 2-3 minutes.  (A.R. at LL-0920-21.)  In addition, Dr. Gans submitted a note to Liberty Life on October 27, 2003, stating that Agin was "totally/permanently disabled," and on November 14, 2003, Dr. Mankoff sent a letter to Liberty Life stating that because of his back problems, Agin's restrictions would include no lifting over 5-10 pounds, no prolonged sitting or standing over 15-20 minutes, and he would need to take frequent breaks and lie down frequently during the day.  (A.R. at LL-0868-69, 0772.)  Dr. Mankoff also opined that Agin's symptoms were chronic and that he was permanently disabled.

On or about December 8, 2003, Susan McCormack, a registered nurse in Liberty Life's MDS Department, reviewed Agin's file at the request of the claim manager responsible for Agin's file. Nurse McCormack stated that while the records provided evidence of a back problem, the etiology of Agin's pain was unclear and Agin's self-reported limitations were inconsistent with the video surveillance.  (A.R. at LL-0024.)  She further stated that she was unable to determine the extent of the impairment and suggested that a consulting physician review the file to determine the level of impairment and whether an independent medical examination ("IME") was warranted.

In December 2003, Liberty Life submitted Agin's file to Dr. Gale Brown, a consulting physician for Liberty Life, for review.  In her January 20, 2004, report summarizing her review, Dr. Brown stated her medical opinion that Agin had a partial physical impairment related to his lumbar spine and left knee conditions requiring certain physical restrictions but that his restrictions did not preclude him from doing full-time sedentary work.  (A.R. at LL-0745.)  She also stated that "there is strong functional evidence supporting a physical capacity consistent with sedentary work," and that "Dr. Gans' opinion[s] regarding physical capacity and disability are inconsistent with the substantial functional evidence and unsupported by the medical documentation reviewed." (Id.) Dr. Brown noted: (1) that the medical evidence did not explain Agin's difficulty with sitting, "as individuals with symptomatic stenosis report relief with sitting"; (2) that there was no evidence for radiculopathy from physical examination or from recent EMG testing; (3) that there were no documented medical complications related to diabetes, GERD, or obesity that would support functional limitations; and (4) that Agin had the demonstrated capacity to perform physical tasks consistent with sedentary work.  (A.R. at LL-0746.)  Dr. Brown also noted that Agin's reported limitations were at odds with the video surveillance:

> In reviewing the video surveillance and accompanying CD's, it is apparent that Mr. Agin has substantial physical capacity to perform various community activities for hours at a time.  These include shopping, frequenting local restaurants and bars, performing various errands.  On videosurveillance, Mr. Agin demonstrated the physical capacity to drive, stand statically, walk, transfer in/out car, carry, lift, and bend without any observed difficulty, use of assisted devices or observed pain behaviors.

(A.R. at LL-0749.)  Although Dr. Brown concluded that there was "strong evidence" supporting Agin's functional capacity for full time sedentary work, she suggest that an IME could be helpful

in defining Agin's current neuromuscular status and obtaining additional information regarding his restrictions and work capacity.  (A.R. at LL–747.)

In April 2004, Liberty Life received a labor market report from MPO Consulting, a vocational rehabilitation consulting firm, regarding potential vocational alternatives that would be available for someone with Agin's functional capacity, work experience, skills, and education.  The report identified several positions that would be appropriate for Agin's skills, education, and work experience, including production superintendent, procurement/purchasing manager, and production coordinator/scheduler.  (A.R. at LL-0752.)

Based upon the recommendation of Dr. Brown, Liberty Life arranged for Dr. Schlomo Mandel, M.D., to perform an IME of Agin.  Dr. Mandel performed the IME on May 20, 2004, and issued his written report on May 24, 2004.  Dr. Mandel indicated in his report that he reviewed the medical records from Agin's providers and the video surveillance and accompanying reports and physically examined Agin.  With regard to the medical records, Dr. Mandel noted "findings consistent with the diagnosis of degenerative lumbar spondylosis with L4-5 foraminal stenosis, post-decompressive laminectomy at L4-5."  (A.R. at LL-0713.)  In commenting upon Agin's impairments and associated restrictions and limitations, Dr. Mandel stated:

> As stated above, this gentleman does have previous imaging evidence of degenerative, as well as postoperative changes in the lower back, which can limit his functional capacity.  Additionally, he is deconditioned.  However, in my opinion, based upon the objective clinical findings, as well as my review of the enclosed surveillance, I believe that he could perform activities that allow a sit/stand option, avoid prolonged ambulation as well as repetitive bending and twisting at the waist, or lifting more than 10-15 pounds on a repetitive basis.

(A.R. at LL-0717-18.)  Dr. Mandel also stated that Agin's complaints and symptoms were "out of proportion and not directly supported by both the clinical signs and imaging as well as

electrodiagnostic testing." (A.R. at LL-0718.) He also concluded: "The accompanying surveillance information is consistent with objective clinical observations; namely, that he is able to stand, walk and bend more than what I observed during the physical examination. The accompanying surveillance information contradicts Mr. Agin's self-reported limitations." (A.R. at LL-0719.)

Liberty Life sent a copy of Dr. Mandel's report to Dr. Gans for his review and comment. On June 23, 2004, Dr. Gans wrote to Deena LeBel, the case manager for Agin's claim, in response to a prior request for review and comment on Dr. Mandel's report. Dr. Gans stated that Agin "has always been a most compliant patient and a hardworking member of society." (A.R. at LL-0696.) Dr. Gans noted that Agin had a history of severe back pain and that "[t]he main problems which constrain Mr. Agin's employability are his chronic severe pain and his generalized decreased mobility brought on by the pain and by his chronic use of powerful pain medications." (Id.) Although Dr. Gans acknowledged the absence of objective medical evidence to explain Agin's pain, he opined that "obviously there is a tremendous disconnect between degree [sic] of objective neurologic signs and severity of pain."

Following its receipt of Dr Gans' letter, Liberty Life submitted Agin's file to Dr. Cynthia Smith of MLS National Medical Evaluations, Inc. for a peer review. In her July 22, 2004, report, Dr. Smith noted:

> The diagnoses that are supported by the medical notes include degenerative lumbar spondylosis with L4-5 foraminal stenosis. He is status post L4-5 laminotomy in 1999. He has chronic low back pain, noninsulin-dependent diabetes mellitus, and obesity. His treating physician indicates that functionally, he is unable to work in any capacity and is completely disabled.

(A.R. at LL-0648.) In response to an inquiry about the sufficiency of the medical evidence to support inability to perform full-time sedentary duties, Dr. Smith wrote:

No, there is not sufficient evidence to support his inability to work in a full time
sedentary position.  There is no objective evidence of radiculopathy.  He has had low
back pain for many years and does have a degenerative condition; however, this does
not preclude working in a sedentary position.  Additionally, examination has shown
no lower extremity weakness, good mobility in the lumbar spine, and ability to rise
from a crouched position.  He has shown good mobility based on the surveillance
tapes and the records of the surveillance tapes.  Therefore, there is no medical
evidence to support his position.

(A.R. at LL-0650-51.)  Dr. Smith identified the same restrictions and limitations as Dr. Mandel, and

she observed that Dr. Gans' recent opinion was inconsistent with and not supported by the medical

evidence.  (A.R. at LL-0651-52.)

After receiving Dr. Smith's report, Liberty Life sent Agin a letter dated August 3, 2004,

informing him of its decision to discontinue benefits.  In its letter, Liberty Life discussed the file

review conducted by Dr. Brown, the IME performed by Dr. Mandel, the independent records review

by Dr. Smith, the transferrable skills analysis, and the surveillance evidence and explained that this

information supported its conclusion that Agin was able to perform sedentary work on a full-time

basis and was thus no longer entitled to disability benefits.  (A.R. at LL-0655-57.)  Liberty Life also

informed Agin of his rights under ERISA to appeal the decision.  Subsequently, on August 16, 2004,

Agin sent Liberty Life a letter in which he requested a review of the decision.  Agin also stated that

he was disappointed with Dr. Mandel's exam because Dr. Mandel did not conduct a thorough exam

of his back.  On August 16, 2004, Agin's counsel sent Liberty Life a letter advising Liberty Life of

his representation of Agin in his appeal and requesting ninety days to submit additional evidence in

support of the appeal.  Liberty Life granted an extension of time to November 23, 2004, for Agin's

counsel to submit additional evidence.

Because of Agin's complaints regarding Dr. Mandel's exam, Liberty Life decided to schedule another IME for December 15, 2005. Prior to the examination, Agin submitted additional medical records and information, including a November 4, 2004, letter from Dr. Stevenson; a September 21, 2004, office note from Dr. Mankoff; an October 5, 2004, MRI report stating that the synovial cyst on the right is "almost certainly of clinical import"; a November 29, 2004, sworn statement from Dr. Gans; a December 3, 2004, report from Dr. Steven Bloom, D.O. (whom Agin retained to perform an IME), in which Dr. Bloom opined that Agin is unable to perform work of any kind, including sedentary work; and a functional performance assessment completed by Barbara Rounds of Consultants At Work, Inc., which concluded that Agin was incapable of working on a full-time basis.

On December 15, 2004, Dr. Patrick G. Ronan, M.D., conducted an IME of Agin. Dr. Ronan subsequently issued a report, which Liberty Life received on January 12, 2005. In his report, Dr. Ronan concluded that Agin had functional limitations based upon pain emanating from the posterior elements of the lumbar spine as well as knee problems, both of which would limit his ability to stand and walk. Dr. Ronan recommended limitations on standing and walking to no more than two hours per day in an eight-hour work day with a maximum of 15 minutes at one time; lifting and carrying 11-20 pounds occasionally, 5-10 pounds frequently, and no limit below 5 pounds. (A.R. at LL-0282.) Liberty Life forwarded a copy of Dr. Ronan's report to Agin's counsel for review. On February 7, 2005, Agin's counsel wrote to Liberty Life regarding his concern that Dr. Ronan had not reviewed the information and records that Agin's counsel had submitted to Liberty Life in December 2004, including Dr. Bloom's report and the Rounds functional performance assessment. In response, Liberty Life contacted Dr. Ronan, and he confirmed that he had, in fact, received and considered both reports. (A.R. at LL-0112, 0189.)

11

Before making its final decision, Liberty Life sent Agin's file to another independent physician, Dr. Philip Marion, a board certified physical medicine and rehabilitation specialist employed by Elite Physicians, Ltd., for a peer review.  In his February 10, 2005, report, Dr. Marion gave the following answer to Liberty Life's question whether, based upon the medical evidence and video surveillance information, Agin had an impairment that prevented him from performing full-time sedentary work on a sustained basis:

> Based on a review of the medical documentation and surveillance information in total, Mr. Agin does not have an impairment, which prevents him from performing full-time sedentary work on a sustained basis as of August 15, 2004 to the present. He is noted to be, otherwise, functionally independent with all activities of daily living, as well as functionally capable of driving a motor vehicle.  However, due to his continued documented use of narcotic opioid medications, it is advised that he not participate in activities involving working with safety sensitive machinery/materials, working at unprotected height or driving a company motor vehicle.  However, he is, otherwise, observed to be independent with all activities of daily living and functional mobility, as well as functionally capable of performing the routine duties of a sedentary job on the sustained basis over an eight-hour day.

(A.R. at LL-0194.)  Dr. Marion also opined that the synovial cyst was not a likely cause of Agin's complaints of pain and should not impair his ability to perform sedentary work with restrictions and that the medications that Agin was using for pain should not impair his ability to function.  (A.R. at LL-1093.)  Finally, Dr. Marion found that Agin's restrictions include standing and walking for no more than two hours over the course of an eight-hour day; lifting no more than 20 pounds; no more than occasional bending, stooping, crawling, or twisting; and upper extremity activity on no more than a frequent basis.  (Id.)

After receiving Dr. Marion's report, Liberty Life referred Agin's file to its vocational rehabilitation department to determine the availability of positions for someone with the restrictions specified by Drs. Ronan and Marion.  David Carey, a vocational case manager in that department,

obtained a third-party labor market survey, which found a number of positions, including production superintendent, procurement manager, and production coordinator.  Mr. Carey then contacted thirteen employers in the Michigan and national economy to determine whether Agin would be qualified for those positions.  These contacts indicated that Agin was qualified to perform several of the identified positions.  (A.R. at LL-0114.)

Based upon the information it had obtained, Liberty Life sent a letter to Agin on April 1, 2005, affirming its decision to discontinue disability benefits.  (A.R. at LL-0099-0107.)  Agin then filed the instant lawsuit seeking a reversal of Liberty Life's decision.

**Discussion**

I.     **Standard of Review**

A threshold issue the Court must decide is the standard of review that applies to Liberty Life's decision to discontinue benefits.  A plan administrator's denial of benefits under an ERISA plan is reviewed *de novo* "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 956-57 (1989); see also Perez v. Aetna Life Ins. Co., 150 F.3d 550, 555 (6th Cir. 1998).  The *de novo* standard of review applies to both the factual determinations and legal conclusions of the plan administrator.  See Wilkins v. Baptist Healthcare Sys., Inc., 150 F.3d 609, 613 (6th Cir. 1998).

Where the plan clearly confers discretion upon the administrator to determine eligibility or construe the plan's provisions, the determination is reviewed under the "arbitrary and capricious" standard.  Wells v. United States Steel & Carnegie Pension Fund, Inc., 950 F.2d 1244, 1248 (6th Cir. 1991).  The arbitrary and capricious standard "'is the least demanding form of judicial review of

administrative action.  When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.'" Davis v. Kentucky Fin. Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1989) (citation omitted) (quoting Pokratz v. Jones Dairy Farm, 771 F.2d 206, 209 (7th Cir. 1985)); see also Miller v. Metropolitan Life Ins. Co., 925 F.2d 979, 984 (6th Cir. 1991) (noting that administrators' decisions "are not arbitrary and capricious if they are 'rational in light of the plan's provisions'") (quoting Daniel v. Eaton Corp., 839 F.2d 263, 267 (6th Cir. 1988)).   In applying this standard, the Court must defer to the administrator's interpretation when the plan vests the administrator with discretion to interpret the plan; an administrator's determination will be overturned only upon a showing of internal inconsistency in the plan or bad faith. Davis, 887 F.2d at 695.  While no particular language is necessary to vest the plan administrator with discretion to interpret the plan or make benefit determinations, the Sixth Circuit "has consistently required that a plan contain 'a *clear* grant of discretion [to the administrator] to determine benefits or interpret the plan.'" Perez, 150 F.3d at 555 (quoting Wulf v. Quantum Chem. Corp., 26 F.3d 1368, 1373 (6th Cir. 1993) (italics and alteration in original)). Moreover, a court may not "merely . . . rubber stamp the administrator's decision," but must actually "exercise [its] review powers." Jones v. Metro. Life Ins. Co., 385 F.3d 654, 661 (6th Cir. 2004) (citing McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir. 2003)). Furthermore, a plan administrator's conflict of interest does not alter the standard of review, but is a factor that should be taken into account in determining whether the  decision was arbitrary and capricious.  See Peruzzi v. Summa Med. Plan, 137 F.3d 431, 433 (6th Cir. 1998).

With respect to the potentially applicable Plan documents, Liberty Life has submitted the following attached to the McGee affidavit: (1) the Liberty Life Policy; (2) the Wausau Policy; (3)

the Spring 1995 Steelcase Summary Plan Description (SPD) (covering all Steelcase ERISA plans);
(4) the Fall 1999 Steelcase SPD (covering all Steelcase ERISA plans); and (5) Chapter 7 of the
current Steelcase SPD covering disability income benefits.  Agin argues that Liberty Life's failure
to identify the controlling Plan document and late submission of these documents constitutes an
impermissible attempt to expand the administrative record.  Moreover, Agin argues, Liberty Life's
failure to identify the controlling Plan document and the provisions that support its decision to
terminate benefits requires that this Court reverse Liberty Life's decision.  The Court disagrees with
Agin's assertion that Liberty Life is attempting to expand the record.  On the contrary, Liberty Life
has simply provided all of the potentially applicable documents for the Court to consider in
determining whether the termination of benefits was proper.  Liberty Life has shown that the Spring
1995 SPD was in effect until it was replaced by the Fall 1999 SPD; that the Wausau Policy provided
coverage for the fully-insured portion of the Steelcase LTD Plan as of April 1999; and that the
Liberty Life Policy provided such coverage as of March 1, 2000.  (McGee Aff. ¶¶ 2, 5-7; Gast Decl.
¶¶ 3-6.)  Moreover, Agin has cited no authority mandating reversal merely because the plan
administrator has failed to  definitively identify the plan documents.

Liberty Life contends that the Court must apply the arbitrary and capricious standard in this
case, citing two bases for applying this standard.  First, although it concedes that the Wausau Policy,
which was in effect at the time Agin became disabled in April 1999, does not contain any language
granting the insurer discretion to determine benefits or to interpret the Plan, it points out that the
1995 SPD, which was in effect at the time Agin's disability arose in April 1999, states that
"[b]enefits are payable when the insurance company has received and approved *proper proof of
loss*."  (A.R. at LL-1394 (emphasis added).)  Liberty Life argues that this language is similar to the

15

"satisfactory evidence" language in <u>Perez v. Aetna Life Insurance Co.</u>, 150 F.3d 550 (6th Cir. 1998) (en banc),  which the Sixth Circuit held granted the insurer sufficient discretionary authority to invoke the arbitrary and capricious standard of review.  <u>See</u> <u>Id.</u> at 556-57.  Alternatively, Liberty Life contends that the arbitrary and capricious standard applies because the Liberty Life Policy, which became effective March 1, 2000, contains a clear grant of authority and was in effect at the time Liberty Life made its decision to discontinue Agin's benefits.  Agin counters that the Wausau Policy, which contains no grant of discretionary authority, controls because Liberty Life cited the Wausau Policy as the controlling document and quoted the definition of "Total Disability" from that policy in both its August 3, 2004, letter notifying Agin of the termination of benefits and in its April 1, 2005, letter denying his appeal.  Agin further asserts that the Wausau Policy is the relevant document because it was in effect when Agin became disabled and applied for long-term benefits in April 1999 and when he was granted those benefits in October 1999.

The Court concludes that the arbitrary and capricious standard applies in this case because the Liberty Life Policy, which contains a clear grant of discretion, was in effect not only when Liberty Life terminated Agin's benefits, but also when Agin initially applied for, and was granted "any occupation" benefits under the Plan.[1]  As noted above, the Steelcase Plan provides short-term and long-term disability benefits, with the first twelve months of benefits being self-funded by Steelcase and subsequent LTD benefits being fully-funded through an insurance policy.  Also, as

---

[1] The Liberty Life Policy provides:

Liberty shall possess the authority, in its sole discretion, to construe the terms of this policy and to determine benefit eligibility hereunder.  Liberty's decisions regarding construction of the terms of this policy and benefit eligibility shall be conclusive and binding.

(A.R. at LL-1312.)  Agin does not dispute that this language requires application of the arbitrary and capricious standard.

16

noted, during the self-funded period, the definition of disability is "own occupation," but the definition changes to "any occupation" after the first twelve months of disability.  Although the Wausau Policy was in effect when Agin became disabled in April 1999, he did not apply for "any occupation" LTD benefits in April 1999.  Rather, Agin applied for and received short-term benefits from April 1999 to October 1999 under the Plan.  Even though Wausau granted Agin LTD benefits in October 1999, those benefits were provided under the self-funded portion of the Plan based upon the "own occupation" definition.  Liberty Life's claim notes show that Agin did not apply for LTD benefits under the "any occupation" definition until March 2000, after the Wausau Policy terminated and the Liberty Life Policy became effective.[2]  (A.R. at LL-0031-32.)  Liberty Life did not approve the claim until April 2000.  Thus, because "any occupation" benefits required a separate application and approval, the Liberty Life Policy, which was then in effect, is the relevant document.

Although the Sixth Circuit has apparently not addressed the issue, several courts have held that, in cases involving welfare benefits, which, unlike pension benefits, do not ordinarily vest, see

---

[2]Although the Court need not address Liberty Life's argument for application of the deferential standard based upon the provision in the 1995 SPD stating that "[b]enefits are payable when the insurance company has received and approved proper proof of loss," it notes that the argument fails because the quoted language is materially different from the language at issue in Perez.  The provision in Perez stated that the insurer "shall have the right to require as part of the proof of claim satisfactory evidence . . . that [the claimant] has furnished all required proofs for [receipt of] benefits." 150 F.3d at 552.  The Sixth Circuit held that this language granted discretion to the plan administrator because the right to require satisfactory evidence connoted the right to make benefit determinations.  See id. at 557.  In contrast, in Hoover v. Provident Life and Accident Insurance Co., 290 F.3d 801 (6th Cir. 2002), the Sixth Circuit held that the de novo standard of review applied because the plan language did not expressly state that the insurer had discretion over the determination of benefits, nor did it contain language requiring "satisfactory" proof of a disability.  See id. at 808.  The plan merely provided that after receipt of "proper" written proof of loss, the insurer was obligated to pay the designated monthly benefits.  See id.  Similarly, in Hug v. Union Central Life Insurance Co., No. Civ. A. 9805047 (DRD), 2006 WL 932100 (D.N.J. Apr. 10, 2006), the policy contained a provision stating, "After we receive your written proof of loss and if your claim is approved, we will pay disability benefits due on a monthly basis.  Benefits for any other loss will be paid as soon as we receive proper written proof of loss."  The court held that this language was not a clear grant of discretion, as it was set forth in a section of the plan that merely described how to file a claim.  See id. at *8.  As in Hoover and Hug, the language cited by Liberty Life does not contain language requiring evidence that is "satisfactory" to the insurer and, as in Hug, the language appears in a section regarding the procedures for filing claims.  Thus, this language is insufficient to invoke the arbitrary and capricious standard of review.

Gregg v. Transp. Workers of Am. Int'l, 343 F.3d 833, 844 (6th Cir. 2003) ("As a matter of law under ERISA, one of the key differences between welfare and pension plans is that welfare plan benefits do not vest.  Consequently, plan administrators may modify a welfare plan's terms at any time, whether or not the employer or union reserved the right to do so." (citations omitted)), a grant of discretion that exists at the time the plan administrator denies benefits is enforceable in a subsequent action for benefits even if the grant of discretion did not exist when the event giving rise to the claim for benefits occurred, when the participant filed the claim for benefits, or when the plan administrator made the initial decision to grant benefits.  For example, in Hackett v. Xerox Corp. Long-Term Disability Income Plan, 315 F.3d 771 (7th Cir. 2003), the plaintiff was granted benefits under the employer's long term disability plan in 1987 as a result of a psychiatric condition that prevented him from doing any type of work.  The plan continued paying benefits to the plaintiff until 1999, when the plan administrator terminated benefits based upon an opinion by the plan's consulting physician.  The plaintiff filed suit challenging the termination and argued that the plan administrator's decision should be reviewed under the *de novo* standard.  At the time the plaintiff was awarded benefits in 1987, the plan did not give the plan administrator discretion to decide claims.  However, in 1996, the employer adopted a new long term disability plan that granted the administrator sole discretion to decide claims.  The 1996 plan was in effect when the plan administrator decided to discontinue the plaintiff's benefits in 1999.  The Seventh Circuit held that the 1996 plan controlled, rather than the version in effect in 1987, because the plaintiff did not have a vested right to disability benefits under the plan.  The court explained:

> This court has held that there exists a presumption against the vesting of benefits unless language in the plan establishes some ambiguity on the issue.  *Rossetto v. Pabst Brewing Co.*, 217 F.3d 539, 544 (7th Cir. 2000).  If benefits have not vested,

18

the plan participant does not have an unalterable right to those benefits. The fact that benefits have not vested suggests that the plan is malleable and the employer is at liberty to change the plan and thus change the benefits to which a participant is entitled. Since the employer can change the plan, then it must follow that the controlling plan will be the plan that is in effect at the time a claim for benefits accrues. *See, e.g., Grosz-Salmon v. Paul Revere Life Insurance Co.*, 237 F.3d 1154, 1159 (9th Cir. 2001) (applying this logic and reaching the same conclusion). We have held that a claim accrues at the time benefits are denied. *Daill v. Sheet Metal Workers' Local 73 Pension Fund*, 100 F.3d 62, 65 (7th Cir. 1996). Therefore, absent any language suggesting ambiguity on the vesting question, the controlling plan must be the plan in effect at the time the benefits were denied.

Id. at 774. The court rejected the plaintiff's argument that a provision from the earlier plan stating that the plan could not be amended to "diminish any rights accrued for the benefit of the participants prior to the effective date of the amendment" gave him a vested right to disability benefits. Id. The court stated that the plaintiff "did not, upon initial determination of eligibility, accrue a right to benefits indefinitely; instead his right to those benefits accrues as the payments become due." Id. Other courts have also concluded that the plan in effect at the time the plan administrator makes its decision to deny benefits is controlling. See Smathers v. Multi-Tool, Inc./Multi-Plastic, Inc. Employee Health & Welfare Plan, 298 F.3d 191, 196 (3d Cir. 2002) (stating that "there was no right that vested, nor is there any issue of retroactivity since the administrator's discretionary authority was in place when that discretion was exercised" (footnote omitted)); McWilliams v. Metro. Life Ins. Co., No. 98-1732, 1999 WL 64275, at 2 (4th Cir. Feb. 11, 1999) (per curiam) (stating that the plan in effect when the decision to deny benefits is made is controlling); Grosz-Salomon v. Paul Revere Life Ins. Co., 237 F.3d 1154, 1160 (9th Cir. 2001) (stating that "[b]ecause no employees' rights were vested, [the plan sponsor] was at liberty to change its long-term disability plan" to include a grant of discretion that was not present when the event giving rise to the claim occurred). The facts in this case provide an even stronger basis for applying the Liberty Life Policy because, while that policy

was not in effect on the date Agin became disabled, it was in effect at the time Agin applied for and was granted "any occupation" LTD benefits in April 2000, and it was the policy in effect when Liberty Life made its decision to discontinue benefits. Moreover, based upon its review of the 1995 SPD and the Wausau Policy, the Court has found no provision in the Plan suggesting that Agin had a vested right to benefits. On the contrary, even though Agin received short term and long term benefits under the "own occupation" definition beginning in April 1999, he had no reason to assume that he would continue to receive disability benefits indefinitely because he had yet to show that he met the "any occupation" definition of disability. Thus, Liberty Life's decision is subject to the deferential standard of review.[3]

## II.    Denial of Benefits

Based upon its review of the evidence in the administrative record, the Court concludes that Liberty Life's decision to terminate Agin's disability benefits was supported by substantial evidence and based upon a reasoned explanation. In concluding that Agin was not totally disabled, Liberty Life relied upon the opinions of five physicians: Dr. Brown, a specialist in pain and rehabilitation management; Dr. Mandel; Dr. Smith; Dr. Ronan; and Dr. Marion, a board certified physical medicine and rehabilitation specialist. Although Drs. Mandel and Ronan were the only physicians who actually examined Agin, all of them concluded that while Agin had physical impairments which imposed restrictions and limitations upon his ability to work, he did not have an impairment that

---

[3]The Court is aware of, and has considered, the Second Circuit's recent decision in Gibbs ex rel. Estate of Gibbs v. CIGNA Corp., 440 F.3d 571 (2d Cir. 2006), in which the court held that the plan in effect when the employee becomes disabled, rather than the plan in effect when benefits are denied, is controlling. See id. at 576-77. The court based its holding upon a prior Second Circuit decision, Feifer v. Prudential Insurance Co. of America, 306 F.3d 1202 (2d Cir. 2002), which held that disability benefits vest with respect to a plan participant no later than the time the participant becomes disabled. The Court declines to follow Gibbs because the Court finds Gibbs and Feifer at odds with Sixth Circuit law, which holds a plan administrator may modify a welfare plan at any time because welfare plan benefits do not vest. See Gregg, 343 F.3d at 844.

prevents him from performing full-time work sedentary work on a sustained basis.  Several of these physicians found that there was no evidence of radiculopathy, that Agin had no weakness in his lower extremities and good mobility in his lumbar spine, and that there was no muscle atrophy.  In addition, all of these physicians concluded that there was strong evidence supporting a functional capacity to perform sedentary work.  Notably, all of these physicians relied upon the extensive video surveillance and written surveillance reports, which established physical activity that was at odds with Agin's self-reported limitations.  In addition to the medical opinions, Liberty Life obtained a labor market report from an outside source and a report from its vocational rehabilitation department, which showed that Agin was qualified to perform a number of full-time sedentary jobs consistent with his limitations and restrictions.

Agin contends that Liberty Life's decision must be reversed because Steelcase and Wausau initially determined that Agin was disabled and there is no objective evidence that his condition has since improved.  Agin further argues that, rather than considering all of the evidence, Liberty Life "cherry picked" the medical evidence out of Agin's file in order to support its termination decision, and at the same time ignored the opinions of his treating physicians, Drs. Gans and Mankoff, who opined that Agin was totally disabled.

First, with regard to Agin's argument that Liberty Life had no basis to reexamine his eligibility for benefits, Wausau's initial grant of LTD benefits merely constituted a determination that Agin was entitled to "own occupation" benefits.  No determination was made until April 2000 regarding Agin's eligibility for "any occupation" benefits.  Even when Liberty Life approved Agin's claim for benefits, it did so with the intent to continue monitoring Agin's situation because of concerns it had about the claim.  (A.R. at LL-0029 (noting that "any occupation" benefits were

approved but that the case manager would continue with the plan for seeking additional medical information).)  In fact, Liberty Life had the right to continue to monitor Agin's condition to ensure that Agin continued to meet the definition of total disability under the Plan.  (A.R. at LL-1311 ("Liberty, at its own expense, will have the right and opportunity to have a Covered Person, whose Injury or Sickness is the basis of a claim, examined or evaluated at reasonable intervals deemed necessary by Liberty.  This right may be used as often as reasonably required."); LL-1339 ("The Insurance Company, at its own expense, will have the right to examine any person for whom a claim is pending as often as it may reasonably require.").)

Agin's primary contention is that Liberty Life's decision was based solely upon its own subjective reassessment of the same evidence it had when it approved Agin's claim for benefits rather than upon any objective evidence showing an improvement in his condition that would render him no longer disabled.  The problem with this argument is that it ignores the surveillance information that Liberty Life received in 2003.  As noted, the video tapes show Agin on various days driving in his car running errands and going to restaurants and bars, typically over a period of several hours.  The video shows Agin getting into and out of his car, walking, and standing with no apparent difficulty and no obvious indication of pain or discomfort.  For example, on October 16, 2003, Agin spent a good part of the day driving to and visiting a retirement home, a restaurant, a grocery store, a liquor store, a shoe store, and a bar, where he apparently played pool.  (A.R. at LL-0891-894.) Apart from the video surveillance, the investigators' reports provide more detail about the extent of Agin's activities and show that he engaged in activities for extended periods of time.  Both the video tapes and the investigators' reports provided new, objective evidence that Liberty Life had not previously considered.  Moreover, that evidence was inconsistent with Agin's report that he was only

22

able to stand for 2-3 minutes, could only sit for 20-30 minutes, and could only walk for 2-3 minutes, (A.R. at LL-0920), and Dr. Mankoff's report that he could not engage in prolonged sitting or standing for more than 15-20 minutes at a time.  (A.R. at LL-0301.)  In addition, Liberty Life had the benefit of opinions from five physicians, based in part upon the surveillance, that Agin could perform full-time sedentary work.  See, e.g., Turner v. Delta Family-Care Disability & Survivorship Plan, 291 F.3d 1270, 1274 (11th Cir. 2002) (holding that the plan was entitled to rely on the opinion of an independent medical examiner to whom the plaintiff was referred in light of recent video surveillance); Vlass v. Raytheon Employees Disability Trust, 244 F.3d 27, 31-32 (1st Cir. 2001) (holding that the plan administrator's decision, which relied in part upon video surveillance evidence, that the plaintiff was not totally disabled was not arbitrary and capricious).  While Agin claims that "the entire corpus of [the video surveillance] does nothing other than confirm the significant limitations imposed on [Agin] by his chronic pain," (Pl.'s Br. at 12), this evidence shows that Agin had substantial abilities to walk, sit, and stand without noticeable pain or difficulty.[4]

Agin also claims that Liberty Life selectively chose the evidence that supported a denial of benefits while ignoring evidence that was favorable to Agin.  The Court disagrees.  The record shows that Liberty Life not only considered the opinions of Agin's physicians, but also asked its own consulting physicians to comment and respond to the concerns of Agin's treating physicians.  Similarly, Liberty Life sought input from Agin's treating physician, Dr. Gans, in response to Dr. Mandel's IME.  And, when Agin expressed concerns about the thoroughness of Dr. Mandel's

---

[4]In his brief, Agin cites video surveillance from December 16, 2004, showing Agin holding his lower back as he enters and exits a Mr. Burger Restaurant.  The Court notes that this video was obtained after Liberty Life denied Agin benefits, while his appeal was pending.  By that time, Agin was obviously aware that he was being surveilled and that prior surveillance indicated that Agin frequented the Mr. Burger Restaurant.

examination, Liberty Life arranged for Dr. Ronan to perform an IME and provided those results to Agin's counsel.  Contrary to Agin's suggestion, this is not a situation, as was the case in Pinto v. Reliance Standard Life Insurance Co., 214 F.3d 377 (3d Cir. 2000), where the insurer essentially relied upon one part of the plaintiff's treating physician's opinion to support its conclusion that the plaintiff was not disabled, but rejected his conclusion, without explanation, that the plaintiff was totally disabled.  See id. at 393-94.  The court in that case noted that the insurer reversed its determination without receiving any additional medical information, and its decision to terminate benefits was apparently based solely upon the denial of Social Security benefits to the plaintiff (a decision that was ultimately reversed).  Id. at 393.  The court rejected the insurer's argument that it should win because the score was "two-to-two," with two physicians finding total disability and two finding not disabled.  The court noted that neither of the insurer's physicians had the same contact with the plaintiff as her treating physician, and one physician was a pulmonologist, which was not the source of the plaintiff's disability identified by her treating physician.  Id. at 394.  Here, although Dr. Gans had a lengthy treating relationship with Agin, as noted above, Liberty Life did receive additional evidence, namely, the video surveillance and investigators' notes.  Liberty Life provided this evidence to five physicians, all of whom found that Agin could perform full-time sedentary work.  Although Agin's physicians reached the opposite conclusion, the primary reason for the difference of opinion appears to be the weight accorded the surveillance evidence.  As noted above, however, that evidence showed Agin performing activities consistent with an ability to do sedentary work.

Agin further argues that Liberty Life's determination is especially suspect because Liberty Life was operating under a conflict of interest.  While recently acknowledging the inherent existence

of such a conflict, the Sixth Circuit noted that a conflict, alone, is not sufficient to undermine an

insurer's determination:

> It is now settled that "'there is an actual, readily apparent conflict . . ., not a mere potential for one,' when the company or plan administrator is the insurer that ultimately pays the benefits." *Gismondi v. United Techs. Corp.*, 408 F.3d 295, 299 (6th Cir. 2005) (alteration in original) (quoting *Killian v. Healthsource Provident Adm'rs*, 152 F.3d 514, 521 (6th Cir. 1998)). But if the conflict of interest did not actually motivate [the insurer's] decision, then it is given no weight as a factor in determining whether the decision was arbitrary and capricious.

Pflaum v. Unum Provident Corp., No. 04-2411, 2006 WL 678960, at *3 (6th Cir. Mar. 15, 2006).

While Liberty Life no doubt was operating under a real conflict of interest, Agin has not shown that

this conflict motivated Liberty Life's decision. Agin asserts that Dr. Ronan is a hired gun of Liberty

Life and that there was something suspicious about his failure to mention Dr. Bloom's report and

the Rounds functional performance assessment in his IME report. The Court rejects these arguments

because Dr. Ronan did, in fact, confirm that he reviewed and considered both reports, and his

opinion was supported by objective evidence showing that Agin retained the capacity to perform

sedentary work. Moreover, while it is true that in Black & Decker Disability Plan v. Nord, 538 U.S.

822, 123 S. Ct. 1965 (2003), the Supreme Court recognized that physicians repeatedly retained by

benefit plans may have an incentive to make a finding of "not disabled" in order to preserve their

business relationship with the plan, it also recognized that it may be equally true that a treating

physician in a close case may favor a finding of "disabled." See id. at 832, 123 S. Ct. at 1971. In

any event, the Court's ultimate holding in Black & Decker was that "plan administrators are not

obliged to accord special deference to the opinions of treating physicians." Id. at 825, 123 S. Ct. at

1967. In short, Liberty Life's decision was supported by substantial evidence, and it had a rational

basis for refusing to credit the opinions of Agin's treating physicians.  Accordingly, the Court will affirm Liberty Life's decision.

## **Conclusion**

For the foregoing reasons, judgment will be entered in favor of Liberty Life.

An Order and Judgment consistent with this Opinion will be entered.


Date:  June 21, 2006                                   _____/s/ Gordon J. Quist_____
                                                       GORDON J. QUIST
                                                       UNITED STATES DISTRICT JUDGE